*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ERIC JAY ANDERSON,

        Defendant-Appellant.

UNPUBLISHED
April 11, 2025
9:52 AM

No. 367035
Gladwin Circuit Court
LC No. 2022-011599-FH

Before: BOONSTRA, P.J., and LETICA and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of two counts of assault with a dangerous weapon (felonious assault), MCL 750.82(1), and one count of reckless driving, MCL 257.626(1). The trial court sentenced defendant to serve two years' probation with 90 days in jail. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On September 20, 2022, Robert Nowak (Robert) drove his white Ford Focus with his wife, Mary Nowak (Mary), as a passenger on M-18. The two were on a day trip to visit friends. As Robert was approaching Beaverton, he saw a sign that the speed limit decreased from 55 to 40 mph. When Robert saw that the speed was further reduced to 30 mph, he braked to reduce his speed.

Defendant was driving behind the Nowaks in a black Chevy Silverado truck. Robert noticed that defendant was driving closely behind the Focus. Robert described defendant's truck as being "glued" to the Focus and thought that it would drive over the Focus. Robert slowed to come to a stop as he approached an intersection. Suddenly, Robert heard two loud "boom" sounds and saw a tire at his driver's side door. Defendant had driven his truck into the side of the Focus. Because of the height difference between Robert's Focus and the truck, Robert was unable to see the driver of the truck. Both Robert and Mary were frightened and alarmed by the sudden contact from the truck. Defendant's truck left black marks on the driver's side rear tire wheelhouse, the driver's side door, the driver's side door handle, and the driver's side rear passenger door, causing nearly $3,000 in damages.

-1-

Defendant proceeded to turn left and drove off.  A startled Robert pulled over to the side of the road and had to adjust his side view mirror that was pointing upward following the collision. Robert attempted to drive the route taken by defendant's truck.  Robert did not want to confront defendant but sought to obtain the truck's license plate number.  Unable to locate defendant's truck, Robert pulled into a gas station.  There, Robert heard a honking vehicle and then was approached by Ben Merrow (Merrow), a witness to the collision.

At noon that day, Merrow was driving his vehicle toward an intersection while traveling southbound on M-18.  In the opposite direction, Merrow saw a white Focus approaching the traffic light with a black truck closely behind it.  It appeared that the truck was pushing the Focus.  Merrow observed defendant drive the truck from behind the Focus, position it right next to the Focus, touch the truck against the Focus's back bumper, and move the truck up toward the driver's door.  When the traffic light turned green, Merrow proceeded through the intersection and observed defendant's truck still leaning against the Focus with defendant yelling from his truck at the Focus.

Merrow went to the gas station and turned around.  He saw Robert follow the route taken by the truck.  Merrow was able to locate the truck at the Beaverton Pharmacy parking lot and then found the Nowaks at the Shell gas station.  Robert was stumbling over his words trying to comprehend what had happened, and Mary was very distraught and unable to speak.  In their respective vehicles, Merrow had the Nowaks follow him back to the pharmacy because he believed that the police station was nearby.  There, Merrow saw defendant get out of his truck wearing a white t-shirt and shorts.  Merrow made eye contact with defendant.  Merrow believed that defendant must have had an issue with the Focus because it was unlikely that someone would drive alongside someone else's car for no reason and react in that manner.

It took Merrow and the Nowaks ten minutes to find the police station because it had moved locations.  They explained what happened to Beaverton Police Chief Brad Davis.  While the Nowaks gave their statement, Merrow returned to the pharmacy to record the truck's license plate number.  He gave the plate number to the police and made a statement.  Before the incident, Merrow saw that the color of the Focus was all white.  After the truck drove away, there was a big black "donut" on the driver's side door.  Defendant did not hit the Focus with enough force to physically move it, but touched it enough to put a tire mark right next to the driver's door.  Merrow explained that, on defendant's truck, the "tire stuck out a little bit farther than his fender."  The truck did not scrape alongside the Focus, but left rubber tire marks on the side.  And Merrow did not observe white paint on the side of defendant's truck.  He believed that the truck driven by defendant was standard height and was not modified.  Merrow explained that he helped the Nowaks because he hoped that someone would assist him in that situation.  Merrow recognized that, without his testimony, it would be the word of the Nowaks against that of defendant.

At the police station, Chief Davis was approached by the Nowaks and Merrow.  It was explained that the Nowaks' Focus was struck twice by a black truck.  The Nowaks were visibly shaking.  Robert prepared a written statement but Mary was unable to do so.  Merrow left the station, but returned with the truck's license plate number.  In light of the witness statements, Chief Davis took photographs of the Focus and retrieved local video footage.  At 11:14 a.m., the Focus was observed driving in front of a gas station followed by defendant's truck.  Although the actual collision was not recorded on video, five minutes later, the Focus was observed with black marks

along the driver's side. In Chief Davis's view, the marks on the Focus reflected two separate hits, not a consistent slide down the side of the car.

Through the license plate, Chief Davis learned defendant was the truck's owner. Additionally, the pharmacy verified defendant's visit that day and provided defendant's phone number. Chief Davis spoke to defendant on the phone about the incident and turned on his body camera to record the majority of the conversation.[1] When contacted and asked about the incident by Chief Davis, defendant first wanted to know what the Nowaks had said. Chief Davis declined to provide any details and again asked defendant what happened. Defendant repeatedly and angrily swore as he claimed that Robert[2] "stomped" on the brakes of the Focus for no reason.[3] He claimed that he exchanged no words with Robert and only displayed his "middle finger." Defendant reiterated that Robert unnecessarily "brake checked" defendant when Robert could have simply slowed down by releasing the gas pedal. As a result of Robert's actions, defendant drove into the left lane and went about his business, including a visit to the pharmacy before driving home. Defendant denied any contact occurred between his truck and the Focus and asked if he should send Chief Davis a picture of his truck. Chief Davis indicated that he might come and take a look at the truck. Then, defendant offered to send Chief Davis a video of the truck's passenger side, noting that there would not be a scratch from a collision, but the truck was rusty on that side. Defendant repeatedly asserted that a collision between his truck and the Focus did not occur.

Moreover, during this conversation, defendant asserted that Robert filed a false police report. And, if defendant had known that Robert would raise a claim, defendant would have

---

[1] Chief Davis testified regarding how he discerned that he was speaking to defendant. Specifically, he called and asked to speak to defendant. The Chief's body camera was turned on about thirty seconds after the conversation began. Chief Davis spoke to defendant on the phone because defendant was not a local resident, but lived in Bay City. At the time of the call, defendant was suspected of driving away from the scene of an accident. Chief Davis did not initially intend on recording the phone call, but did so because defendant "became very inflammatory, very defensive, [and] very loud." The trial court admitted the recording of the phone conversation, and it was played for the jury. During the phone conversation, Chief Davis proposed driving to Bay City to see defendant's vehicle. But, later at trial, the Chief testified that that he did not think anything would be gained by driving there. Defendant was obviously upset, and Chief Davis opined that a personal visit would have "just inflamed the situation even more." Moreover, Chief Davis testified that this was not the typical Beaverton automobile accident. Most accidents in the city involved drivers in two collided vehicles waiting for the police to arrive to take a traffic crash report.

[2] At the time of the incident, Robert was 79 years old and Mary was 80 years old.

[3] Minimally, defendant denied contact between his truck or tire with the Focus on at least ten occasions. A sampling of these statements included: (1) "I did nothing"; (2) "[M]y vehicle didn't hit nobody"; (3) "[W]e did not hit each other"; (4) "I did not hit him"; and (5) "Neither one of us made contact with our vehicles." Additionally, defendant asserted that the false claim was raised by "a liberal," but the photographs of the Focus did not appear to have any features identifying a political affiliation.

"punched him in the f***ing face." When asked if defendant's tire made contact with Robert's vehicle, he paused before answering "No." He explained that he "would have known" if he made contact with the Focus because he drives "a lot." Defendant continued to swear and call Robert names such as, "Mr. False Police Report," and "Mr. Stomp on his Brakes." He then wished that he had hit the Focus in such a manner to get a new truck. Defendant then claimed that after he came out of the pharmacy, Robert was "looking to f***ing fight with me or some sh**[.]" Defendant initially stated that he was not tailgating the Focus, but later stated that he would have probably hit the Focus if he had not moved into the left turn lane.

Chief Davis then advised defendant that he would send a report to the prosecutor's office that included defendant's claim that Robert was filing a false police report. Defendant stated that Robert's report was technically false because Robert "brake checked" defendant for no reason. Once again, defendant claimed that there was no contact between the vehicles. Defendant then advised that he was going to examine his truck "to make sure [he's] not hallucinating." Chief Davis then inquired whether defendant was going to e-mail presumably photographs or videos when defendant interjected to state his tire did not stick out passed the wheel wells. He added that he did not have big tires on his truck, only stock size. It is apparent from defendant's statements with the Chief that defendant denied that his truck was involved in accidental or purposeful contact with the Focus.

During trial, Chief Davis acknowledged that Merrow did not believe the impact between the two vehicles was very hard. And the Chief admitted that it was possible that defendant was unaware of the impact between the two vehicles. Although there was mention during the conversation of Chief Davis viewing defendant's truck, he did not do so. Chief Davis reiterated that nothing would be gained from an in-person examination in light of defendant's demeanor. Additionally, there was no paint transfer on the Focus. Therefore, it did not appear to be a situation of metal striking metal. Instead, the damage was consistent with a tire rubbing up against paint. Although Chief Davis opined that the impact was forceful enough to burn the paint, he did not think that defendant's tires would reflect injury because of the rubber. Chief Davis also did not receive photographs from defendant, opining that they were not pertinent.

On redirect examination, Chief Davis testified that defendant stated his only communication with the Nowaks was with his middle finger. In the Chief's experience, the middle finger was normally not a "good gesture" and was commonly accompanied "with angry and inflammatory behaviors." Defendant also appeared to be angry during the phone conversation. On recross examination, Chief Davis acknowledged that the act of giving someone the middle finger alone was not assaultive.

Defendant did not testify at trial or present additional evidence. After deliberating, the jury convicted defendant as charged.

## II. JURY INSTRUCTIONS

Defendant asserts that he was deprived of his right to present a complete defense when the court denied his request for a jury instruction on the defense of accident. We disagree.

-4-

Claims of instructional error involving questions of law receive de novo review, "[b]ut a trial court's determination whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006) (quotation marks and citation omitted). "An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *People v Bailey*, 330 Mich App 41, 50; 944 NW2d 370 (2019) (quotation marks and citation omitted). A defendant who presents a claim of instructional error on appeal bears the burden of establishing that the failure to provide the requested instruction resulted in a miscarriage of justice. *People v Hawthorne*, 474 Mich 174, 182; 713 NW2d 724 (2006); see also MCL 769.26.[4]

Both the federal and state Constitutions entitle a criminal defendant to "a meaningful opportunity to present a complete defense." *California v Trombetta*, 467 US 479, 485; 104 S Ct 2528; 81 L Ed 2d 413 (1984); see US Const, Ams V, VI, and XIV; Const 1963, art 1, §§ 13 and 20. But the right to present a defense includes only relevant and admissible evidence. *People v Zitka*, 335 Mich App 324, 333; 966 NW2d 786 (2020). Instructional errors that directly impact a defense theory can contravene a defendant's due process right to present a defense. *People v Kurr*, 253 Mich App 317, 326-327; 654 NW2d 651 (2002). "[A] criminal defendant is entitled to have a properly instructed jury consider the evidence against him or her." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 8 (quotation marks and citation omitted). The jury instructions must include all elements of the charged offenses and must not exclude material issues, defenses, or theories supported by the evidence. *Id*. A trial court must grant a request for a jury instruction on a theory if it is supported by the evidence. *Id*. Where there is insufficient record evidence to support the defense of "accident," it is erroneous to provide the instruction to the jury. *People v Mills*, 450 Mich 61, 84; 537 NW2d 909 (1995), mod 450 Mich 1212; 539 NW2d 504 (1995).

"A defendant asserting an affirmative defense must produce some evidence on all elements of the defense before the trial court is required to instruct the jury regarding the affirmative defense." *Id*. at 34-35 (quotation marks and citation omitted). The presentation of an affirmative defense does not negate some elements or facts. *People v Aspy*, 292 Mich App 36, 49; 808 NW2d 569 (2011) (citation omitted). Rather, an affirmative defense admits to the doing of the charged act, but presents a justification, excuse, or mitigation of the action. *Id*.

The elements of felonious assault are defendant's commission of "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Nix*, 301 Mich App 195, 205; 836 NW2d 224 (2013). "An assault may be established by showing either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005). After 1979, felonious assault was characterized as a specific intent crime. *People v Johnson*, 407 Mich 196, 210; 284 NW2d 718

---

[4] MCL 769.26 states, in pertinent part, "No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

(1979); *People v Starghill*, 99 Mich App 790, 792; 298 NW2d 641 (1980). "[W]hen some form of intentional act must be established as an element of the crime, the occurrence of the crime is inconsistent with accident." *People v Hess*, 214 Mich App 33, 37; 543 NW2d 332 (1995). But "[t]he defense of accident [is] not an affirmative defense because [a] defendant [does] not bear the burden of negating intent." *People v Propp*, 508 Mich 374, 382; 976 NW2d 1 (2021).

The instruction that defendant sought to have included was M Crim JI 7.3a, Accident as Defense to Specific Intent Crime. Defendant proposed that the jury be instructed:

> The defendant says that he is not guilty of count one—Assault with a dangerous weapon, or count two—Assault with a dangerous weapon because he did not intend to injure Robert Nowak and/ or Mary Nowak. The defendant says that his conduct was accidental. If the defendant did not intend to injure, he is not guilty. The prosecutor must prove beyond a reasonable doubt that the defendant intended to assault.

But, the trial court did not include this instruction, concluding that "there was absolutely no testimony, whatsoever, regarding the incident being an accident, nor was there any questioning of the existing witnesses that—or, the witness to the incident regarding whether it appears to be an accident, or not." Indeed, in his statement to Chief Davis, defendant denied contact by his truck or tire with the Focus on approximately 16 occasions. Defendant stated that he would know if he made contact with the Focus because he drives "a lot." Defendant blatantly denied any contact with the Focus that would have damaged the vehicle and did not alternatively offer that if he made contact with the Focus it was accidental.

Indeed, in the trial court, defense counsel requested the accident instruction without providing a factual basis or identifying the evidence admitted at trial to support its theory. In response, the prosecution alleged that defendant's statement, admitted as evidence, completely denied that the incident occurred, not that it was an accident, and there was no testimony to the contrary. The attorneys then argued over the types of proofs necessary to support an accident instruction and whether it required a defendant to testify. At the conclusion of this generic argument that did not reference the admitted evidence, the trial court denied the accident instruction, noting that there was no testimony or reference to the incident as accidental in nature.

In light of the record, particularly defendant's extensive denials of any contact between the vehicles, the trial court did not abuse its discretion by concluding that there was no factual support to warrant the accident instruction. *People v Guajardo*, 300 Mich App 26, 34; 932 MW2d 409 (2013). Moreover, even if defendant accidentally struck the Focus on one occasion, Robert testified that there were two separate "booms," and the photographic damage to the Focus was inconsistent with one continuous scraping. The admitted evidence did not support the instruction. *Mills*, 450 Mich at 84.

For the first time on appeal, defendant asserts that, because he continued to run errands and did not flee the area, he lacked a "guilty conscience as he believed that he had only yelled at the Nowaks and given them the finger which are not crimes." In essence, because flight evidenced a guilty conscience, defendant contends that his failure to flee should be construed as accidental contact. And, defendant now argues that his statement, in which he denied making contact between

his truck and the Focus, reflect "that he did not know that he may have hit the car." But, in the trial court, after introduction of the photographs of damage to the Focus or otherwise, defendant never contended that his truck caused the damage and that he was unaware of the contact. Again, there was no record evidence to support accident or a mistake of fact. Nonetheless, despite the lack of evidence to support the accident instruction, the trial court acknowledged that it would not preclude the defense from asserting accident in closing argument. Accordingly, defendant's theory of accident or unknowing contact was submitted to the jury by the defense. Defendant's contention that the failure to provide the requested instruction resulted in a miscarriage of justice is not supported by the record under the circumstances. *Hawthorne*, 474 Mich at 182.[5]

## III. PROSECUTORIAL ERROR

Defendant next alleges that the prosecution committed error by improperly bolstering Merrow's testimony and by making improper arguments in closing arguments.[6] Defendant further argues that trial counsel was ineffective for failing to object to the alleged errors. We disagree.

"To preserve a claim of prosecutorial error, a defendant must timely and specifically challenge the prosecutor's statements or conduct." *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 9. Defendant did not object to the prosecutor's question to Merrow on redirect examination or to the prosecutor's closing argument, and these arguments are unpreserved. See *id*. When a *Ginther*[7] hearing is not held, appellate review of claims of ineffective assistance is reduced to examining claims of mistakes apparent on the record. *People v Norfleet*, 317 Mich App 649, 658; 897 NW2d 195 (2016).

We review a preserved claim of prosecutorial error de novo to determine whether the defendant was denied a fair trial. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Unpreserved claims of prosecutorial error are reviewed for plain error affecting the defendant's substantial rights. *Thurmond*, ___ Mich App at ___; slip op at 9. Therefore, defendant must demonstrate that an error occurred, the error was clear or obvious, and the error affected the

---

[5] Also on appeal, defendant contends that there was evidence of accident because Chief Davis testified, on cross-examination, that it was possible that defendant was unaware of the impact. However, there was no foundation to preface the question or support the answer. Rather, Robert testified that there were two loud "booms" that accompanied the truck's contact with the Focus. Although Merrow testified that he saw the truck touch the Focus, his view of the incident was from across the intersection. Neither party admitted expert testimony to explain the level of force or contact necessary to leave tire or rubber marks on the Focus and any commensurate sound.

[6] Defendant also alleged that it was erroneous to allow Chief Davis to testify, over objection, regarding his belief about the collision and the report sent to the prosecution. But, after referencing this trial testimony, defendant did not rationalize the basis of this claim or cite to supporting authority, thereby abandoning it. *People v Henry*, 315 Mich App 130, 148-149; 889 NW2d 1 (2016).

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

outcome of the lower court proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"Whether a defendant has received ineffective assistance of counsel is a mixed question of fact and constitutional law." *People v Yeager*, 511 Mich 478, 487; 999 NW2d 490 (2023) (citation omitted). The trial court's factual findings are reviewed for clear error, and questions of constitutional law are reviewed de novo. *Id*. "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016).

## A. ERROR

"The test for prosecutorial error is whether the defendant was denied a fair trial." *Thurmond*, ___ Mich App at ___; slip op at 10. "We review claims of prosecutorial error on a case-by-case basis by examining the record and evaluating the prosecution's remarks in context." *People v Jackson (On Reconsideration)*, 313 Mich App 409, 425-426; 884 NW2d 297 (2015). This Court has explained:

> A prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness or mischaracterize evidence. However, the prosecutor may argue from the evidence, and reasonable inferences from it, to support a witness's credibility. The prosecutor also may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes. [*People v Isrow*, 339 Mich App 522, 529-530; 984 NW2d 528 (2021) (quotation marks and citations omitted).]

"Jurors are presumed to follow the trial court's instructions, and instructions are presumed to cure most errors." *People v Serges*, ___ Mich App at ___; ___ NW3d ___ (2024) (Docket No. 355554); slip op at 18 (quotation marks and citation omitted).

## 1. BOLSTERING OF MERROW

Defendant argues that the prosecution improperly bolstered Merrow's testimony by asking during redirect examination why he felt it was important to testify. Merrow replied that he was doing what he hoped another person would do for him in a similar situation "because it's my word against his." The prosecutor's question did not convey that the prosecutor had " 'some special knowledge concerning a witness' truthfulness.' " *Isrow*, 339 Mich App at 529, quoting *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). Moreover, "the credibility of a witness is an issue of the utmost importance in every case . . ." and "evidence of a witness' bias or interest in a case is highly relevant to his credibility." *People v Mumford*, 183 Mich App 149, 152; 455 NW2d 51 (1990) (quotation marks and citations omitted). Merrow saw the collision between the vehicles, tracked down defendant's truck in the pharmacy parking lot, found the Nowaks, and aided them in locating the police station. When the Nowaks were speaking to Chief Davis, Merrow returned to the pharmacy to record defendant's license plate number and examined the truck for damage. Whether Merrow's actions and testimony were premised on a bias or interest was pertinent to his

credibility. *Id*. Defendant failed to demonstrate plain error arising from this unpreserved issue. *Carines*, 460 Mich at 763.

Additionally, we reject defendant's challenge to the prosecutor's question addressing the reason for Merrow's testimony as irrelevant in light of the cross-examination by defense counsel. Specifically, defense counsel questioned Merrow regarding the manner in which defendant drove his truck and the damage to the truck, including whether there were scrape marks or white paint on the side and the extension of the tires beyond the fender. Then, defense counsel inquired whether Merrow had any previous contact, interactions, or communications with any individuals involved in the incident. In light of defense counsel's questions, the prosecution, on redirect, addressed whether Merrow had any bias or interest in the matter that impacted his credibility. The prosecution's question was pertinent when considered in its context, and the prosecution's question did not improperly bolster Merrow's credibility. See *Isrow*, 339 Mich App at 529.

## 2. CLOSING ARGUMENT

Defendant next asserts that the prosecutor improperly argued that defendant's act of "giving the finger" supported the prosecution's theory of assault and deprived defendant of due process. We conclude that the prosecutor's remark, examined in context, did not negatively affect the fairness, integrity, or public reputation of the judicial process. See *People v Dobek*, 274 Mich App 58, 87; 732 NW2d 546 (2007).

A prosecutor may not abandon the responsibility to seek justice, and in turn, deny the defendant a fair and impartial trial. *People v Lane*, 308 Mich App 38, 62; 862 NW2d 446 (2014). Additionally, the defendant's right to a fair trial may be denied by improper remarks that taint the trial with unfairness rendering the resulting conviction a denial of due process. *Id*.; see also *Donnelly v DeChristoforo*, 416 US 637, 643; 94 S Ct 1868; 40 L Ed 2d 431 (1974). A prosecutor's closing remarks may provide an overview of the evidence provided at trial. See *People v Ericksen*, 288 Mich App 192, 199; 793 NW2d 120 (2010). A prosecutor may "argue the evidence and all reasonable inferences arising from it." *Jackson (On Reconsideration)*, 313 Mich App at 426 (quotation marks and citation omitted).

The prosecutor argued that defendant admitted that he "acted in such a fashion as to threaten" the Nowaks when he gave them "the finger." Specifically, in defendant's phone conversation with Chief Davis that was laden with expletives, defendant advised that he did not say a word to Robert and that the "only thing [Robert] saw was my middle f***ing finger." The issue is whether the prosecutor's argument that defendant's gesture constituted a threatening act was a reasonable inference arising from the evidence. *Id*. Again, we review a prosecutor's allegedly erroneous remarks in context. *Id*. at 425-426. The prosecutor noted that "the finger, in and of itself," may not be "an aggressive, assaultive thing," but encouraged the jury to consider defendant's gesture in the context of "everything else" it had heard.[8] Indeed, defendant's display

---

[8] Defendant relied on *People v Dalessandro*, 165 Mich App 569, 581; 419 NW2d 609 (1988) for the proposition that a prosecutor's comments and appeal to jury sympathy by constantly referencing "the poor innocent baby" was applicable to the present case and warranted a new trial.

of "the finger" followed Robert hearing two loud booms and observing defendant's tire at the driver's side door; in effect, defendant's use of his vehicle as a weapon. Under the circumstances, the prosecutor's characterization of defendant's gesture was a reasonable inference. Accordingly, the prosecution's argument did not deny defendant his right to a fair trial, let alone amount to plain error affecting substantial rights. See *Thurmond*, ___ Mich App at ___; slip op at 9-10.

Regardless, the jury received instructions regarding out-of-court statements, circumstantial evidence, the attorneys' arguments not being evidence, and the relevant law governing intent. "Jurors are presumed to follow the trial court's instructions, and instructions are presumed to cure most errors." *Serges*, ___ Mich App at ___; slip op at 18 (quotation marks and citation omitted). Thus, even if there had been error, the jury instructions cured it.

## B. INEFFECTIVE ASSISTANCE

Defendant additionally contends that trial counsel was ineffective for allowing the prosecutor "to ask improper questions and to make improper comments during his closing argument." We disagree.

The United States and Michigan Constitutions require that criminal defendants receive effective assistance of counsel in their defense. *Shaw*, 315 Mich App at 672, citing US Const Am VI; Const 1963, art 1, § 20. "[T]he proper standard for attorney performance is that of reasonably effective assistance." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish ineffective assistance of counsel and entitlement to a new trial, defendant must establish that (1) the performance of trial counsel was "below an objective standard of reasonableness" under prevailing professional norms and (2) "but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (citations omitted).

As discussed, defendant failed to establish that trial counsel performed below an objective standard of reasonableness under prevailing professional norms. Specifically, the prosecutor did not bolster Merrow's testimony by inquiring regarding the importance of testifying. After defense counsel questioned Merrow's relationship or knowledge of the parties before the incident, the prosecutor inquired regarding Merrow's motivation for his actions. The prosecutor's questioning was proper because bias and interest is a pertinent inquiry for the assessment of witness credibility. *Mumford*, 183 Mich App at 152. And the prosecutor's argument regarding defendant's use of the middle finger was a reasonable inference arising from all the evidence. "Failure to raise a futile objection or advance a meritless argument does not constitute ineffective assistance of counsel." *Isrow*, 339 Mich App at 529. Trial counsel, therefore, was not ineffective for failing to object to the prosecution's questioning and arguments.

---

However, in *Dalessandro*, the cumulative effect of improprieties, including the improper use of impeachment evidence, appeal to juror sympathy, and the ineffective assistance of counsel, warranted a new trial. *Id*. at 581-582. Such cumulative improprieties are not present in this case.

IV. OPINION TESTIMONY

Defendant contends that the trial court erred by allowing Chief Davis to testify that defendant was the individual that he spoke to on the phone and to the nature of the collision without being qualified as an expert. We disagree.

The appellate court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). A trial court's decision to admit evidence will not be disturbed unless that decision falls outside the range of principled outcomes. *Id*. at 251-252 (quotation marks and citation omitted). Preserved nonconstitutional errors are subject to harmless-error review. *Id*. at 252, citing MCL 769.26. Accordingly, defendant "has the burden of establishing a miscarriage of justice under a 'more probable than not' standard." *Id*. (citation omitted).

At the time of trial,[9] MRE 104(a) provided in relevant part: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court . . . ." MRE 701 provided that lay witness testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 702 provided:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

A. VOICE IDENTIFICATION

MRE 901(b) provides "examples of authentication or identification conforming with the requirements of this rule." At the time of defendant's trial, MRE 901(b)(5)[10] provided,

---

[9] MRE 104, MRE 701, and MRE 702 were recently amended, effective January 1, 2024. 512 Mich lxv; 512 Mich lxxxviii-lxxxix. These amendments appear to have made only stylistic changes. MRE 702 was also amended a second time, effective May 1, 2024. 513 Mich 1201. This second amendment apparently makes a substantive change to the standard for admitting expert testimony; however, it was not in effect at the time of defendant's trial.

[10] MRE 901 was amended effective January 1, 2024. All changes to the relevant portion of MRE 901 were stylistic. MRE 901, as amended September 20, 2023, 511 Mich 1254.

Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

Our Supreme Court has held that this rule "requires no more" than "having a knowledgeable witness identify the voices on the tape." *People v Berkey*, 437 Mich 40, 50; 467 NW2d 6 (1991). Additionally, "[v]ocal identification evidence is competent if the identifying witness demonstrates certainty . . . in the mind . . . by testimony that is positive and unequivocal." *People v Murphy (On Remand)*, 282 Mich App 571, 584; 766 NW2d 303 (2009).

Chief Davis testified that he learned defendant's identity through the truck's license plate. Additionally, he confirmed with the pharmacy that defendant visited the pharmacy on the day of the collision. And, the pharmacy gave defendant's phone number to Chief Davis. Chief Davis dialed defendant's number, asked for defendant, and the person that answered confirmed that he was defendant. Chief Davis also testified that he listened to defendant's arraignment hearing and that the recording contained defendant's voice. When asked how confident he was that the voice on the phone call was the same voice that he heard in the arraignment recording, Chief Davis answered, "One hundred percent." He further elaborated on how he knew the voices were the same:

> Just talking. I talk to tons of people all the time. Obviously, if you talk to somebody in person versus a recording or over the phone, they're a little bit different, but when they're both over the phone or both a recording and a phone, you get a lot better idea that it's the same person. I guess it would be a nasally voice and just the pronunciation of words and things of that nature.

This testimony is "positive and unequivocal" that the voice on the recording was defendant's voice. Chief Davis heard defendant identify himself by name—circumstances that connected the recording with defendant. There was sufficient evidence to authenticate the recording, and the trial court did not abuse its discretion by allowing Chief Davis to testify regarding the phone conversation with defendant. *Thorpe*, 504 Mich at 252.

## B. ACCIDENT RECONSTRUCTION

Defendant additionally contends that Chief Davis was not qualified to provide an opinion on the cause of the marks to Nowak's vehicle because Chief Davis was not qualified as an expert witness. When a police officer gives testimony based on training and experience, the relationship between the two rules becomes "somewhat unclear." *People v Dixon-Bey*, 321 Mich App 490, 497; 909 NW2d 458 (2017). However, when the prosecution in good faith elicits testimony that requires expert qualification from a witness who has not been qualified, and the witness has sufficient background and experience to provide expert testimony, the testimony is admissible and there is no error requiring reversal. See *Dobek*, 274 Mich App at 79.

"This Court has admitted lay opinion testimony from investigating police officers regarding fault in traffic accidents when the testimony was the result of direct observations and analysis of the accident scene." *Miller v Hensley*, 244 Mich App 528, 531; 624 NW2d 582 (2001). It is not an abuse of discretion for a trial court to admit an opinion formed by an officer's

"perceptions based on examining photographs and the scene" if the opinion "could be made by people in general . . . and [was] not overly dependent on scientific, technical, or specialized knowledge." *Richardson v Ryder Truck Rental, Inc*, 213 Mich App 447, 455-456; 540 NW2d 696 (1995).

In this case, Chief Davis opined that the marks on the Nowaks' vehicle "would be consistent with a hit, a move over, and . . . a hit again." Chief Davis had taken photographs of the vehicle, and he based his conclusion on the marks on the vehicle. A photograph of the vehicle, which the jury saw, showed a black mark on the wheel well and a larger black mark across the doors. A layperson could reasonably see two separate marks on a car and conclude that the car was hit twice by another vehicle; no specialized or technical knowledge would be required to reach that conclusion. Because Chief Davis reached a reliable conclusion that a layperson could make without specialized knowledge, the trial court did not abuse its discretion by allowing this testimony. *Thorpe*, 504 Mich at 252.

## V. JUROR CHALLENGES

Defendant claims that trial counsel was ineffective for failing to use peremptory strikes to remove four jurors who were related to or knew the Gladwin County Sheriff or the prosecuting attorney. We disagree.

As discussed, because a *Ginther* hearing was not held, our review is limited to mistakes apparent from the record. Counsel is ineffective if "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that that outcome would have been different." *Yeager*, 511 Mich at 488 (quotation marks and citation omitted). There is a reasonable probability that the outcome would have been different if the probability is sufficient to undermine confidence in the outcome. *Id*.

Criminal defendants have a right to be tried by an impartial jury. *People v Haynes*, 338 Mich App 392, 411; 980 NW2d 66 (2021). The trial court conducts voir dire and removes biased jurors in order to ensure a defendant's jury is impartial. *Id*. "The purpose of voir dire is to elicit enough information for development of a rational basis for excluding those who are not impartial from the jury." *Id*. (quotation marks and citation omitted). "Jurors are presumed to be . . . impartial, until the contrary is shown." *People v Miller*, 482 Mich 540, 550; 759 NW2d 850 (2008) (quotation marks and citation omitted; alteration in original). A defendant bears the burden of establishing reasonable doubt regarding the juror's impartiality. *Id*. Furthermore, "an attorney's decisions relating to the selection of jurors generally involve matters of trial strategy, . . . which we normally decline to evaluate with the benefit of hindsight." *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001) (citations omitted).

Defendant contends that trial counsel was ineffective because, despite having remaining peremptory strikes, trial counsel did not strike four jurors. These jurors were related to or otherwise knew the Gladwin County Sheriff. One of the four jurors had also been the eighth-grade teacher of the prosecuting attorney. However, each juror expressed that they would remain neutral despite these relationships. Declining to strike jurors who have stated they will remain impartial does not fall below an objective standard of reasonableness. See *Yeager*, 511 Mich at 488.

-13-

## VI. SUFFICIENCY OF THE EVIDENCE

Finally, defendant argues that his right to due process was violated because he was convicted premised on insufficient evidence. We disagree.

We review de novo challenges to the sufficiency of the evidence. *People v Savage*, 327 Mich App 604, 613; 935 NW2d 69 (2019). "Due process requires the prosecutor to introduce evidence sufficient for a trier of fact to find the defendant guilty beyond a reasonable doubt." *People v Jarrell*, 344 Mich App 464, 480; 1 NW3d 359 (2022), citing *Jackson v Virginia*, 443 US 307, 317; 99 S Ct 2781; 61 L Ed 2d 560 (1979). When there is a challenge to the sufficiency of the evidence, this Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jarrell*, 344 Mich App at 480 (quotation marks, citation, and emphasis omitted). We are "*required* to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018) (quotation marks and citations omitted). Circumstantial evidence and reasonable inferences from the evidence are sufficient to prove the elements of a crime. *Id*.

"The elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Nix*, 301 Mich App 195, 205; 836 NW2d 224 (2013); see also MCL 750.82(1).[11] Defendant asserts that the prosecution failed to prove the intent element. "Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent." *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021). The only element defendant challenges on appeal is the intent element.

There was sufficient circumstantial evidence of intent to support defendant's felonious assault convictions. Robert was driving his Focus north on M-18 in an area where the 40 mph speed limit was reduced to 30 mph. Because of the change, Robert, a former long-time employee of a road commission, braked the Focus to reduce his speed. Robert had noticed that a black truck was following closely behind. According to Robert it seemed that the truck was going to drive over the Focus. As Robert approached an intersection, he experienced two loud booms and saw a tire at the driver's side door. Robert was unable to see or identify the driver because of the height difference between the truck and the Focus. Robert expressly identified two separate and distinct "booms" or contacts and did not report a single scraping incident across the length of the Focus. In light of the truck striking the Focus, Robert and Mary, his passenger, were scared and frightened.

Across the intersection travelling south on M-18, Merrow saw defendant's truck seemingly pushing the Focus then driving to the side of the Focus. From across the intersection, Merrow observed the truck touch the Focus. Initially, when Merrow observed the Focus it was white in color. When he saw the Focus again, there were black donut marks across the side doors. As a

---

[11] MCL 750.82 was recently amended, but this amendment did not change the elements of felonious assault for the purposes of this case. See MCL 750.82, as amended by 2023 PA 272.

result of his observation, Merrow turned around after proceeding through the intersection, located the truck in a pharmacy parking lot, and assisted the Nowaks in locating the police station.

When contacted by Chief Davis, defendant denied any contact between his truck or tires with the Focus. Defendant became angry when he learned of the Nowaks' police report and wished that he had physically harmed Robert. Defendant never posited or explained that any contact between the vehicles occurred, that the contact was the result of an accident, or that the truck malfunctioned, causing the contact. Rather, defendant claimed that he merely gave Robert the middle finger for stomping on his brakes.

Chief Davis secured video footage of the Focus driving with defendant's truck following closely behind. Within five minutes, the Focus was recorded on video with the damage to the driver's side. From this evidence, the jury could reasonably infer that defendant intended to either injure the Nowaks in their Focus or cause them to fear an immediate battery. There was sufficient evidence to support the felonious assault convictions.

Affirmed.

/s/ Mark T. Boonstra
/s/ Anica Letica
/s/ Michelle M. Rick